

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MERCURY SKYLINE YACHT                )
CHARTERS, an Illinois corporation doing  )
business as CHICAGO'S FIRST LADY      )
CRUISES,                             )
                                     )      No. 05 C 1698
            Plaintiff,               )
                                     )      Judge Mark Filip
      v.                             )
                                     )
THE DAVE MATTHEWS BAND, INC.,        )
a Virginia corporation, and STEFAN A.  )
WOHL, an individual,                 )
                                     )
            Defendants.              )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Mercury Skyline Yacht Charters, Inc., d/b/a Chicago's First Lady Cruises

("MSYC" or "Plaintiff"), filed a complaint in the Circuit Court of Cook County on February 23,

2005, against Dave Matthews Band, Inc. ("DMB") and Stefan A. Wohl ("Wohl") (collectively,

"Defendants"). On March 23, 2005, Defendants filed a Notice of Removal of the case to this

Court based upon diversity jurisdiction. (D.E. 1.)[1]

Plaintiff's Complaint, which is attached to the Notice of Removal, brings the following

claims against Defendants: trespass ("Count I"); public nuisance ("Count II"); tortious

interference with business relationships ("Count III"); gross negligence ("Count IV"); and

negligence ("Count V"). (*Id.*) The case is before the Court on DMB's and Wohl's motions to

dismiss (D.E. 11, 14) for failure to state claims upon which relief can be granted, *see* Fed. R. Civ.

P. 12(b)(6), and motions to strike certain requests for damages. *See* Fed. R. Civ. P. 12(f). For

---

[1] The various docket entries in this case are designated "D.E. ___."

the reasons stated below, Defendants' motions to dismiss and to strike are granted in part and denied in part.

## FACTS[2]

In the summer of 2004, Wohl was an employee of DMB whose duties included driving one of the Four Seasons motor coaches leased by DMB for its summer concert tour. (D.E. 1 ¶ 8.) The Four Seasons motor coach is equipped with, among other things, an 80 to 100 gallon collection tank for human waste. (*Id.* ¶ 14.) The tank is emptied by pushing a toggle switch located behind the driver's seat. (*Id.*) The contents of the coach's tank empty through a drain located underneath the motor coach, and a full tank can be emptied in 90 seconds to 2 minutes. (*Id.*) Wohl's responsibilities relating to the operation of the leased Four Seasons motor coaches included the disposal of the contents of the coach collection tank. (*Id.* ¶ 15.)

According to the Complaint, on August 7 and 8, 2004, DMB performed two concerts in East Troy, Wisconsin, at the Alpine Valley Music Theater. (*Id.* ¶ 11.) DMB's concert tour schedule causes the band to regularly travel through the state of Illinois, and DMB stayed at the Peninsula Hotel in downtown Chicago, Illinois, for its Wisconsin concert dates. (*Id.* ¶¶ 7, 11, 33.) On August 7 and 8, Four Seasons motor coaches were used to transport DMB, its crew, and equipment between the Peninsula Hotel and the Wisconsin concert site. (*Id.* ¶ 11.) On Sunday, August 8, at around 1 p.m., Wohl started driving a Four Seasons motor coach from a City of Chicago coach staging area located on Kinzie Street, west of the Chicago River, and traveled east on Kinzie Street. (*Id.* ¶¶ 13, 18.) Wohl was driving the motor coach to the Peninsula Hotel

---

[2] The following facts are taken from Plaintiff's Complaint. For present purposes, the Court accepts the allegations as true, as precedent instructs. The Court takes no position on whether the allegations are actually well-founded.

2

where he was to provide transportation to a member of DMB. (*Id.* ¶ 18.) Wohl's route took him over the Chicago River via the Kinzie Street bridge. (*Id.* ¶¶ 16, 18.) The Kinzie Street bridge has a large, open grated area at its center. (*Id.* ¶ 16.)

On summer weekend days, the downtown section of the Chicago River is used and traveled by a substantial number of commercial and recreational watercraft; this river traffic is readily visible from adjacent Chicago roadways and bridges. (*Id.* ¶ 17.) On Sunday, August 8, the motor vessel *Chicago's Little Lady* ("*Chicago's Little Lady*"), U.S. Coast Guard No. 1079694, was traveling northbound on the Chicago River. (*Id.* ¶ 19.) *Chicago's Little Lady*, which was operated by MSYC, was carrying approximately 117 passengers, 3 crew members, and a volunteer docent from the Chicago Architectural Foundation. (*Id.*) At 1:18 p.m., the same time as Wohl was driving over the Kinzie Street bridge, *Chicago's Little Lady* passed below the Kinzie Street bridge. (*Id.* ¶ 19.)

As Wohl drove the motor coach over the grated portion of the Kinzie Street bridge, he slowed the vehicle. (*Id.* ¶ 20.) Wohl then intentionally discharged the contents of the motor coach's human waste collection tank through the drain underneath the coach. (*Id.*) The contents of the tank fell from the bottom of the motor coach, through the grates of the Kinzie Street bridge, into the Chicago River and onto *Chicago's Little Lady*. (*Id.* ¶ 22.)

The discharged contents of the tank—a foul-smelling, brownish-yellow liquid—drenched the vessel and dozens of its passengers, getting into passengers' eyes, mouths, and hair and soaking their clothing and personal belongings. (*Id.* ¶ 27.) Many passengers experienced nausea and vomiting from their exposure or proximity to the human waste. (*Id.* ¶ 29.) The waste spill onto *Chicago's Little Lady* and its passengers and crew prompted the ship's captain to turn the

3

vessel around and return the ship to its landing. (*Id.* ¶ 30.)

The Complaint further alleges that in the weeks following the dumping incident, MSYC personnel spent considerable time, energy, and money cleaning up *Chicago's Little Lady.* (*Id.* ¶ 32.) MSYC also addressed passenger refund requests and other passenger needs. (*Id.*) In addition, MSYC responded to the local, national, and international media, and cooperated with law enforcement officials. (*Id.*)

Plaintiff alleges that Defendants' tortious actions "proximately caused MSYC to suffer damages, including but not limited to lost profits from its architectural tour and charter business . . . ." (*Id.* ¶ 38.) For each count, Plaintiff seeks compensatory damages in excess of $50,000 and punitive damages in the amount of $5,000,000 and such other relief as the Court deems just and proper. (*See, e.g., id.* at 9)

Wohl's motion seeks dismissal of (1) Counts I, II, IV and V for failure to state a cause of action because Plaintiff's recovery is barred by the application of the economic loss doctrine of Illinois law, (2) Count III for failure to state a cause of action for tortious interference with business relationships, and (3) Count II for failure to state a claim for public nuisance. (*See* D.E. 14.) DMB's motion requests that the Court: (1) dismiss Count III for failure to allege the elements of tortious interference with business relationships; (2) dismiss Count IV for gross negligence for failing to plead a recognized cause of action; (3) strike or dismiss the claim for punitive damages in each Count against DMB; and (4) strike or dismiss certain damages claims relating to Counts I and II. (*See* D.E. 11.) As explained below, the motions are denied in part and granted in part.

4

## LEGAL STANDARDS

"A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of a complaint for failure to state a claim upon which relief may be granted." *Johnson v. Rivera*, 272 F.3d 519, 520-21 (7th Cir. 2001). In ruling on a motion to dismiss, the court must assume all facts alleged in the complaint to be true and view the allegations in the light most favorable to plaintiffs. *See, e.g., Singer v. Pierce & Assocs., P.C.*, 383 F.3d 596, 597 (7th Cir. 2004); *Marshall-Mosby v. Corp. Receivables, Inc.*, 205 F.3d 323, 326 (7th Cir. 2000). Dismissal for failure to state a claim is appropriate where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Lee v. City of Chicago*, 330 F.3d 456, 459 (7th Cir. 2003).

"A federal court exercising diversity jurisdiction must consult the choice-of-law rules of the state in which the court sits to determine which state's substantive law should apply." *Reid by Reid v. Norfolk & W. Ry. Co.*, 157 F.3d 1106, 1110 n.3 (7th Cir. 1998) (citing *GATX Leasing Corp. v. Nat'l Union Fire Ins. Co.*, 64 F.3d 1112, 1114 (7th Cir. 1995)). Illinois courts apply the law of the state where the tort occurred, unless another state has a more significant relationship to the occurrence or to the parties. *See id.* (citing *Walters v. Maren Eng'g Corp.*, 617 N.E.2d 170, 173 (Ill. App. Ct. 1993)). The Court will apply Illinois law in this case, because the alleged tort occurred in Illinois, and because Illinois has the most significant relationship to the occurrence and to the parties, based on Illinois being the place of injury, the domicile of the Plaintiff, and the place where the parties' relationship is centered. *See id.; see also Frederick v. Simmons Airlines, Inc.*, 144 F.3d 500, 504 (7th Cir. 1998).

## DISCUSSION

I.      Economic Loss Rule

Defendant Wohl moves to dismiss Counts I, II, IV, and V on the basis that Plaintiff has failed to state a basis upon which the requested relief can be granted. Wohl argues that Plaintiff's requested economic damages in the form of lost profits are not recoverable under Illinois law because Plaintiff has not alleged any property damage. The Court disagrees with Wohl's arguments and finds that Plaintiff has alleged sufficient property damage to support its claim for lost profits.

"At common law [in Illinois], solely economic losses are generally not recoverable in tort actions;" this well-established proposition of Illinois law has come to be known as the economic loss rule. *See In re Chicago Flood Litig.*, 680 N.E.2d 265, 274 (Ill. 1997) (citing *Ill. Bell Switching Station Litig.*, 641 N.E.2d 440, 446 (Ill. 1994)). In *Moorman Manuf. Co. v. Nat'l Tank Co.*, 435 N.E.2d 443 (Ill. 1982), the Illinois Supreme Court adopted the economic loss rule and held that a products liability plaintiff cannot recover solely economic losses under the tort theories of strict liability, negligence, and innocent misrepresentation. *See id.* at 453. *Moorman* defined economic loss as "damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits—without any claim of personal injury or damage to other property as well as the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold." *Id.* at 449 (internal citations and quotation marks omitted). The court reasoned that "[t]ort theory is appropriately suited for personal injury or property damage resulting from a sudden or dangerous occurrence . . . The remedy for economic loss, loss relating to a purchaser's disappointed

6

expectations due to deterioration, internal breakdown or nonaccidental cause, on the other hand, lies in contract." *Id.* at 450; *accord, e.g., Ill. Bell Switching Station Litig.*, 641 N.E.2d at 444 ("The *Moorman* holding is bottomed upon the theory that tort law affords a remedy for losses occasioned by personal injuries or damage to one's property, but contract law and the Uniform Commercial Code offer the appropriate remedy for economic losses occasioned by diminished commercial expectations not coupled with injury to person or property.").

Subsequent Illinois Supreme Court cases applied the economic loss rule outside of the products liability context. In *Redarowicz v. Ohlendorf,* 441 N.E.2d 324 (Ill. 1982), a person who bought a home from a prior homeowner brought a negligence claim against the original builder, seeking recovery for the costs of repairing and replacing faulty construction of the home. *See id.* at 326. The court applied the economic loss rule and held that the plaintiff/homeowner could not recover the repair and replacement costs, which the court characterized as solely economic losses, "disappointed expectations" and "loss of bargain." *See id.* In *Anderson Elec., Inc. v. Ledbetter Erection Corp.*, 503 N.E.2d 246 (Ill. 1986), the Illinois Supreme Court applied the economic loss rule in a services context. *See id.* at 247. In *Anderson Elec., Inc.*, a third party had hired the plaintiff to do electrical contracting and had hired the defendant to inspect and supervise the work. *See id.* The plaintiff brought a negligence claim against the defendant in its supervisory role, and the court held that "a plaintiff seeking to recover purely economic losses due to defeated expectations of a commercial bargain cannot recover in tort, regardless of the plaintiff's inability to recover under an action in contract." *Id. at* 249.

A recent Illinois Supreme Court case has further defined the scope of the economic loss rule. In that case, *In re Chicago Flood Litig.*, plaintiffs brought multiple claims against the City

of Chicago—including claims for private nuisance and negligence—stemming from a flood caused by a city contractor in a city-owned, underground freight tunnel. *See id.*, 680 N.E.2d at 268. Plaintiffs, who included numerous individuals and businesses in the area of the flood, as well as an insurer of individuals and area businesses, sought damages from the city for losses caused by the flood, including: injury to property; lost revenues, sales, profits and good will; lost wages, tips and commissions; lost inventory; and expenses incurred in obtaining alternate lodging. *See id.* The court reviewed several certified questions under an interlocutory appeal, one of which was "whether the *Moorman* doctrine bars the claims of those plaintiffs who allege only economic loss." *Id.* at 269.[3] The Illinois Supreme Court affirmed the lower courts' decisions to dismiss the claims of plaintiffs who had not alleged property damage, because those plaintiffs did not satisfy any of the three exceptions to the economic loss rule. *Id.* at 275. The Illinois Supreme Court instructed that the three exceptions are:

> (1) where the plaintiff sustained damage, *i.e.*, personal injury or property damage, resulting from a sudden or dangerous occurrence; (2) where the plaintiff's damages are proximately caused by a defendant's intentional, false representation, *i.e.*, fraud; and (3) where the plaintiff's damages are proximately caused by a negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transaction.

*Id.* (internal citations omitted). The court in *In re Chicago Flood Litig.* also held that plaintiffs who had alleged unspecified property damage were barred from recovering under the economic loss doctrine. *See id.* at 277.

---

[3] The Illinois Supreme Court in *In re Chicago Flood Litig.* noted that "[o]ur answers to these certified questions do not affect the applicability of the Tort Immunity Act to these claims." *Id.*, 680 N.E.2d 265, 274 (Ill. 1997). Because the analysis of defendants' liability proceeded independently from any considerations of municipal immunity, this Court finds that the court's economic loss rule in *In re Chicago Flood Litig.* can be readily applied to the case *sub judice*.

Turning to the case at hand, the Court concludes that Plaintiff's claims for lost profits are not barred by the economic loss doctrine because Plaintiff's allegations satisfy the first exception to the economic loss rule, as articulated in *In re Chicago Flood Litig. See id.* at 275-76 (stating that the first exception to the economic loss rule "is composed of a sudden, dangerous, or calamitous event coupled with personal injury or property damage."); *accord, e.g., Trans States Airlines v. Pratt & Whitney Canada, Inc.*, 682 N.E.2d 45, 48 (Ill. 1997) ("'The event, by itself, does not constitute an exception to the economic loss rule. Rather, the exception is composed of a sudden, dangerous, or calamitous event coupled with personal injury or property damage.'") (quoting *In re Chicago Flood Litig.*, 680 N.E.2d at 275).

The Court will consider in turn the two elements of the first exception to the economic loss rule. *See, e.g., Mars, Inc. v. Heritage Builders of Effingham*, 763 N.E.2d 428, 435 (Ill. App. Ct. 2002) (describing the inquiry into the first exception to economic loss rule as "necessarily bipartite"). Courts have, somewhat circularly, defined a sudden and dangerous occurrence as "when the sudden occurrence is 'highly dangerous and presents the likelihood of personal injury or injury to other property.'" *Mars, Inc.*, 763 N.E.2d at 435 (quoting *Stepan Co. v. Winter Panel Corp.*, 948 F. Supp. 802, 808 (N.D. Ill. 1996)). Because Plaintiff's allegations suggest that the dumping of the human waste from the motor coach in the present matter happened quickly (*see, e.g.,* D.E. 1 ¶ 29, 30 (the "spill" of waste "hit" and "drenched" ship and passengers)), and presented a material risk of personal injury or injury to property (*see, e.g., id.* ¶ 29, 30 ("noxious" waste "soaked the vessel and passenger's clothing and personal belongings")), the incident resembles events that courts applying Illinois law have found to be "sudden, dangerous, or calamitous." *See In re Chicago Flood Litig.*, 680 N.E.2d at 275-76 (underground flood); *MCI*

9

*Worldcom Network Servs., Inc. v. Big John's Sewer Contractors, Inc.*, No. 03 C 4991, 2003 WL 22532804, at \*3 (N.D. Ill. Nov. 7, 2003) (Castillo, J.) (excavation in violation of statutes); *Mars, Inc.*, 763 N.E.2d at 436 (thunderstorm); *Elecs. Group. Inc. v. Cent. Roofing Co.*, 518 N.E.2d 369, 371 (Ill. App. Ct. 1987) (substantial leaking of water through roof in single day); *United Airlines Inc. v. CEI Indus. of Ill., Inc.*, 499 N.E.2d 558, 562-63 (Ill. App. Ct. 1986) (roof collapse). Precedent teaches that to satisfy the first exception to the economic loss rule, "the time period between the calamitous event (the collapsing roof, brake failure, or flood) and the damage to other property (the inventory and equipment, the vehicle, or water damage to a store) is short and sudden, almost contemporaneous." *Nabisco v. Am. United Logistics*, No. 99 C 0763, 2000 WL 748131, at \*6 (N.D. Ill., June 1, 2000) (Ashman, M.J.) (collecting cases to illustrate what is and "what is not a sudden or calamitous occurrence."). The contemporaneousness of the dumping and the damage to *Chicago's Little Lady* distinguishes the case at hand from cases where courts have not found a sudden or calamitous event. *See, e.g., id.* at \*6 (gradual and prolonged seeping of chemicals through packaging of food products was not sudden or calamitous); *NBD Bank v. Krueger Ringier, Inc.*, 686 N.E.2d 704, 708 (Ill. App. Ct. 1997) (collecting cases and holding that petroleum gradually leaking through ruptured underground storage tanks and into soil was not a sudden or calamitous occurrence).

Turning to the element of property damage, Plaintiff alleges that *Chicago's Little Lady* was "contaminat[ed]" and that cleaning up the ship required "considerable time, energy and expense . . . ." (D.E. 1 ¶¶ 32, 40.) The allegations relating to the ship's condition after the spill are incorporated by reference in all the subsequent counts. (*See, e.g., id.* ¶ 34.) The Court views Plaintiff's property damage allegations as falling within the range of property damage that courts

have found sufficient, when coupled with a sudden or calamitous event, to apply the first exception to the economic loss rule. *See, e.g., In re Chicago Flood Litig.*, 680 N.E.2d at 276 (lost perishable inventory); *MCI Worldcom Network Servs., Inc.*, 2003 WL 22532804, at *3 (severed fiber optic cable); *In re Starlink Corn Prods. Liab. Litig.*, 212 F. Supp. 2d 828, 842-43 (N.D. Ill. 2002) (Moran, J.) (contaminated corn crop); *United Airlines, Inc.*, 499 N.E.2d at 562 (water damage to "walls, furniture, furnishings").

Wohl contends that *Palatine Nat'l Bank v. Charles Greengard Assocs. Inc.*, 456 N.E.2d 635 (Ill. App. Ct. 1983), is on point and establishes the proposition that clean up costs are to be treated as separate from property damage. (*See* D.E. 14 at 4.) The Court respectfully disagrees. In *Palatine Nat'l Bank*, property developers brought a tort action against an engineering firm, alleging that the firm had designed an inadequate storm and surface water drainage system. *See id.*, 456 N.E.2d at 637. The court found that "[t]he only possible allegation of property damage . . . the clean up and restoration of the premises due to the flood" was insufficient to meet the standard for the first exception to the economic loss doctrine, because "the damage relates to the natural accumulation of water on the premises and not to the 'type of sudden and dangerous occurrence best served by the policy of tort law.'" *Id.* at 638-39 (quoting *Moorman Manuf. Co.*, 435 N.E.2d at 450). Plaintiff's allegations of "human waste dumping" (*see, e.g.*, D.E. 1 ¶ 32) differ significantly from the "natural accumulation of water" in *Palatine Nat'l Bank*, (*id.*, 456 N.E.2d at 639), and as was discussed previously, fall into the category of a sudden or dangerous occurrence. In addition, because the damages in *Palatine Nat'l Bank* sprang from the allegedly negligent performance of contracted-for services, the damages could also have been categorized as disappointed commercial expectations (*see id.* at 638), which precedent teaches are barred by

11

the economic loss rule. *See, e.g., id.* at 638-39; *Redarowicz,* 441 N.E.2d at 326.

In summary, Plaintiff's allegations of a "sudden, dangerous or calamitous event," *i.e.,* the alleged dumping, coupled with the allegations of the contamination of *Chicago's Little Lady,* are sufficient to permit Plaintiff to state a claim for recovering lost profits under the first exception to the economic loss rule.[4] Accordingly, the Court finds that Plaintiff's claims are not barred by the economic loss doctrine and denies Wohl's motion to dismiss Counts I, II, IV, and V.

II.      Tortious Interference with Business Relationships

Both DMB and Wohl have moved to dismiss Count III for tortious interference with business relationships on the grounds that Plaintiff has failed to state a claim upon which relief can be granted. Defendants argue that the Complaint falls short of making out a claim for either tortious interference with contract or tortious interference with prospective business relationships. The Court agrees.

---

[4] Although Wohl's motion to dismiss Counts I, II, IV, and V on the basis of the application of the economic loss doctrine is denied, the Court notes that it respectfully disagrees with Plaintiff's arguments that *Congregation of the Passion, Holy Cross Province v. Touche, Ross & Co.,* 636 N.E.2d 503 (Ill. 1994), would permit recovery in the present matter in the absence of allegations of property damage. (Plaintiff's Response to Wohl's Motion to Dismiss at 4.) *Congregation of the Passion, Holy Cross Province* is one in a line of Illinois professional malpractice cases, where courts evaluated whether the defendants' duty arose under the contract for professional services or whether the professional owed an extracontractual duty to the plaintiff that would permit an action in tort. *See id.,* 636 N.E.2d at 514 ("The evolution of the economic loss doctrine shows that the doctrine is applicable to the service industry only where the duty of the party performing the service is defined by the contract that he executes with his client."); *see id.* at 515 (holding that the duty an accountant owes to his client is extracontractual and so the economic loss doctrine does not bar recovery for solely economic losses); *see also 2314 Lincoln Park W. Condominium Assoc. v. Mann, Gin, Ebel & Frazier, Ltd.,* 555 N.E.2d 346, 353 (Ill. 1990) (conducting similar analysis and holding that economic loss doctrine barred plaintiff's recovery in tort against architect for solely economic damages because architect's responsibility originated in contract). Because the parties in the present matter have no contractual relationship for professional services, the narrow exception to the economic loss rule explored in cases such as *Congregation of the Passion, Holy Cross Province* is inapplicable.

12

The Complaint contains allegations that suggest that Plaintiff is claiming both interference with existing contracts ("ticketed passengers"), as well as interference with prospective business relationships ("prospective passengers"). (D.E. 1 ¶¶ 44, 48.) Although Count III is somewhat vague, it appears to attempt to allege both of the standard tortious interference commercial torts—tortious interference with an existing contract and tortious interference with a prospective business relationship. The Court will assume that Plaintiff is attempting to invoke both torts, and will analyze both of them. For the reasons explained below, the Court finds that neither tort has been sufficiently pleaded on the facts as alleged.

The elements of a claim for tortious interference with an existing contract are: "'(1) the existence of a valid and enforceable contract between the plaintiff and another, (2) the defendant's awareness of that contract, (3) the defendant's intentional and unjustifiable inducement of a breach of the contract, (4) a subsequent breach by the other, caused by defendant's wrongful conduct, and (5) damages.'" *Int'l Mktg., Ltd. v. Archer-Daniels-Midland Co.*, 192 F.3d 724, 731 (7th Cir. 1999) (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 676 (Ill. 1989)). Where the plaintiff's economic expectancy has not yet solidified into a contractual relationship, he can still recover in tort by showing: "'(1) [a] reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from the interference.'" *Int'l Mktg., Ltd.*, 192 F.3d at 731 (quoting *Dowd & Dowd, Ltd. v. Gleason*, 693 N.E.2d 358, 370 (Ill. 1998)).

Plaintiff's allegations fail with respect to multiple elements of the tort of intentional

13

interference with contract. First, Plaintiff has not sufficiently alleged that Defendants were aware of Plaintiff's contracts with ticketed passengers. Plaintiff's sole allegation that could potentially relate to knowledge of existing contracts is its statement that Defendants "knew or should have known that this portion of the Chicago River, including the area near Kinzie Street bridge, is highly traveled by commercial and recreational watercraft." (D.E. 1 ¶ 24.) Precedent teaches that allegations of actual awareness of existing contracts are required. *See, e.g., Kraft Chem. Co. v. Ill. Bell Tel. Co.*, 608 N.E.2d 243, 247 (Ill. App. Ct. 1992) (finding that plaintiffs failed to show that defendant landscapers, who severed an underground fiber optic cable and interrupted communications service, had specific knowledge of existing contracts for phone service between the proposed customer class and telephone company); *accord, e.g., HPI Health Care Servs., Inc.*, 545 N.E.2d at 676. Plaintiff's allegation of Defendants' knowledge about Chicago River watercraft activity falls short of alleging that Defendants was actually aware of Plaintiff's contracts with ticketed passengers.

Plaintiff implicitly concedes that it has not pleaded a basis to satisfy this element of the tort, as Plaintiff states in a response brief that the Defendants had "constructive knowledge" of the Plaintiff's business relationships and expectancies. (Plaintiff's Response to DMB's Motion to Dismiss at 2.) Plaintiff offers no authority in support of its "constructive knowledge" position, nor for its related assertion that "actual or constructive knowledge of the operation of commercial tour boats necessarily includes awareness of commercial expectancies of the commercial tour boat operators with their passengers." (*Id.* at 8.) More specifically, Plaintiff offers no authority to suggest that an "awareness of commercial expectancies" is sufficient knowledge of a contract. The one case that Plaintiff cites for this point, *NEG Micon USA, Inc. v. N. Alternative Energy,*

14

No. 03 C 5851, 2004 WL 609373 (N.D. Ill. Mar. 23, 2004) (Guzman, J.), involved a defendant corporate entity charged with tortiously interfering with a contract; the defendant corporation was formed by individuals who had been officers of the corporation that was a party to the disputed contract at the time the contract was formed. *See id.* at *2. Under that factual scenario, the court understandably found the element of knowledge to be sufficiently alleged. *See id.* at *4 ("NEG Micon alleges Navitas was aware of the Agreement between NEG Micon and NAE.").

Second, Plaintiff has not alleged that Defendants intentionally and unjustifiably induced a breach of contract. *See Panter v. Marshall Field & Co.*, 646 F.2d 271, 298 (7th Cir. 1981) ("Illinois courts have consistently held that the plaintiff must allege . . . facts which demonstrate that the defendants acted with the purpose of injuring the plaintiff's expectancies.") (collecting cases). As a practical matter, it seems to the Court to be difficult for a defendant intentionally to interfere with a contract of which it is unaware, and, perhaps tacitly acknowledging this issue, Plaintiff has omitted such an allegation from its complaint. Plaintiff alleges that Defendants intentionally discharged the waste while traveling on the bridge (D.E. 1 ¶ 46), but Plaintiff does not allege that the nonaccidental discharge was in any way intended to induce a breach of contract. *See HPI Health Care Servs., Inc.*, 545 N.E.2d at 676 (discussing the "generally recognized" "elements of this tort" in Illinois, which include "'the defendant's intentional and unjustified inducement of a breach of the contract'") (quoting *Prudential Ins. Co. v. Van Matre*, 511 N.E.2d 740, 744 (Ill. App. Ct. 1987) (further internal quotation and citation omitted).

Plaintiff also cites the Restatement (Second) of Torts, § 767 cmt d., which says that a "plaintiff must show that the interference was 'either desired by the actor or known by him to be a substantially certain result of his conduct.'" (Plaintiff's Response to DMB's Motion to Dismiss

15

at 9 (quoting Restatement).) This statement would appear to hurt Plaintiff's cause, not assist it. Plaintiff does not allege that the Defendants intended or desired to interfere with its contracts or business expectancies; instead, the Complaint alleges that the Defendants intended to discharge the waste on the bridge. (*See id.* (citing D.E. 1 ¶ 46).) Neither the Complaint nor common experience suggest that it is "substantially certain" that something dropped off of the Kinzie Street bridge, even for 90 to 120 seconds, will strike any boat. And while the Court need not verge outside the corners of the Complaint to resolve the motion to dismiss, when one thinks of the Plaintiff's proffered "substantial certainty" criterion, it is hard to ignore the practical, commonsense reality that there are geometrically more pleasure craft that travel that section of the Chicago River than ticketed tour boats. In any event, and simply put, the Complaint, at least as presently framed, does not outline any basis to conclude that the Defendants intentionally induced the passengers of Plaintiff to breach their contracts or intended to interfere with Plaintiff's putative commercial relationships.

When analyzed as a potential claim for tortious interference with prospective business advantage, Count III also fails. First, Plaintiff's claim is defective with respect to intentional interference, as explained immediately above.

Second, Plaintiff alleges a "reasonable expectation of continuing to have business relationships with architectural tour and charter customers." (D.E. 1 ¶ 45.) However, Plaintiff does not allege that Defendants had knowledge of that expectation—such an omission is fatal to a claim for tortious interference with prospective business advantage. *See, e.g., Futurevision, Inc. v. Dahl*, 487 N.E.2d 127, 131 (Ill. App. Ct. 1985) (dismissing claim and stating "[a] necessary element to state a cause of action for interference with a prospective business

16

advantage is defendant's knowledge of a reasonable business expectancy and defendant's intentional interference which prevents the expectancy from ripening into a valid business relationship.") (collecting cases).

Third, Plaintiff fails to allege that Defendants directed any misdeeds towards future clients of the Plaintiff, as is required under Illinois law. Plaintiff alleges that Defendants "recklessly, wantonly and maliciously interfered with MSYC's prospective business relationships with tour and charter passengers by subjecting it to unwanted and negative media attention that deterred prospective passengers from doing business with it." (D.E. 1 ¶ 48.) However, while Plaintiff alleges Defendants' intentional interference with its prospective business relationships, the action alleged, *i.e.*, the dumping of waste, was directed at Plaintiff rather than at prospective passengers. As explained by then District Judge Rovner in *Westland v. Sero of New Haven, Inc.*, 601 F. Supp. 163 (N.D. Ill. 1985), "an allegation of conduct directed by defendant toward a third party through which the defendant purposely causes that third party not to enter into or continue with a prospective contractual relationship with the plaintiff is essential to stating a cause of action for the tort of intentional interference with a prospective business opportunity." *Id.* at 166 (collecting cases); *accord, e.g., Schuler v. Abbott Labs.*, 639 N.E.2d 144, 147 (Ill. App. Ct. 1993) ("Plaintiff must also allege action by the interfering party directed towards the party with whom the plaintiff expects to do business."); *Cohabco Cigar Co. v. U.S. Tobacco Co.*, No. 98 C 1580, 1999 WL 988805, at *13 (N.D. Ill. Oct. 22, 1999) (Kocoras, J.) (similar); *McIntosh v. Magna Sys., Inc.*, 539 F. Supp. 1185, 1193 (N.D. Ill. 1982) (Aspen, J.) (collecting cases and holding that "the tort of intentional interference with a prospective business opportunity requires that plaintiff allege some conduct directed toward a third party through which defendants purposely cause that

17

third party not to enter into or continue a prospective contractual relationship with plaintiff.").[5] Because Plaintiff solely alleges acts of intentional interference that were directed at Plaintiff itself rather than at prospective passengers, it does not state a required element of the claim for tortious interference with prospective business relationships.

For all of these reasons, the Court holds that Plaintiff has failed to state a claim for either tortious interference with contract or with prospective business relationships and so dismisses Count III without prejudice.

III.     Gross Negligence

DMB moves to dismiss Count IV on the basis that Illinois law does not recognize gross negligence as a cause of action. (*See* D.E. 13 at 10.) The Court agrees with DMB that Count IV should be dismissed. Regarding distinctions between different degrees of negligence, longstanding Illinois Supreme Court precedent instructs that "the authorities establish the proposition that the rights of the parties are not affected by any question of the degree of . . . negligence." *Chicago, R.I. & P. Ry. Co. v. Hamler*, 74 N.E. 705, 708 (Ill. 1905). Courts generally have interpreted *Chicago, R.I. & P. Ry. Co.* as eliminating the cause of action for gross negligence in Illinois. In this regard, most notably, in *Merit Ins. Co. v. Colao*, 603 F.2d 654, 659 (7th Cir. 1979), the Seventh Circuit cited *Chicago, R.I. & P. Ry. Co.* and taught that "Illinois does not recognize gross negligence as an independent ground for recovery." *Accord, e.g., Instituto Nacional de Comercializacion Agricola v. Cont'l Ill. Nat'l Bank & Trust Co. of Chicago*, 530 F. Supp. 279, 283 (N.D. Ill. 1982) (Shadur, J.) (treating claim for gross negligence

---

[5] The Court notes that Plaintiff does not allege that the intentional discharge of waste onto the passengers deterred current passengers from buying a ticket from MSYC for another river trip.

18

as a simple negligence action because "Illinois does not recognize an action for gross negligence."). Under this caselaw, including the Seventh Circuit's teaching, the Court accepts DMB's argument that Illinois does not recognize gross negligence as an independent cause of action.[6] Accordingly, the Court grants DMB's motion to dismiss Count IV.

Plaintiff apparently acknowledges the tenuousness of the claim of gross negligence and suggests that Count IV properly could be reframed as a claim for willful and wanton conduct. (*See* Plaintiff's Response to DMB's Motion to Dismiss at 11.) However, precedent also instructs that Illinois does not recognize an independent cause of action for willful and wanton conduct. *See Ziarko v. Soo Line R.R.*, 641 N.E.2d 402, 406 (Ill. 1994) (collecting Illinois appellate cases and holding that "[t]here is no separate and independent tort for 'willful and wanton' misconduct."); *accord, e.g., Sorkin v. Blackman, Kallick & Co.*, 540 N.E.2d 999, 1003 (Ill. App. Ct. 1989) ("[w]illful and wanton misconduct affects the amount of damages and is not a separate tort."). Instead, willful and wanton conduct typically is alleged in conjunction with both intentional torts and negligence to support a claim for punitive damages.[7] *See Kelsay v.*

---

[6]    The Court acknowledges Plaintiff's citation of *Mathias v. Accor Econ. Lodge*, No. 01 C 6329, 2002 WL 221523, at *4 (N.D. Ill. Feb. 13, 2002), which denied a motion to dismiss a claim for gross negligence and defined gross negligence as "an action that is committed with actual or deliberate intention to harm or with an utter indifference or conscious disregard for the safety of others." Because *Mathias* appears to conflict with the weight of authority, including the teaching of the Seventh Circuit, the Court respectfully declines Plaintiff's invitation to rely on it.

[7]    Willful and wanton misconduct may properly be alleged as a basis for liability where the cause of action is against one of various governmental entities, officials, or employees in cases where an immunity statute establishes a standard of "willful and wanton misconduct" as a basis for assessing liability. *See, e.g., Am. Nat'l Bank & Trust Co. v. City of Chicago*, 735 N.E.2d 551, 555 (Ill. 2000) (finding that allegations supported claims that paramedics and city engaged in willful and wanton misconduct, precluding a dismissal based on immunity under Illinois Emergency Medical Services Act); *Munizza v. City of Chicago*, 583 N.E.2d 561, 565-66 (Ill. App. Ct. 1991) (holding that plaintiffs had alleged insufficient facts to plead willful and wanton

19

*Motorola, Inc.*, 384 N.E.2d 353, 359 (Ill. 1979) ("[i]t has long been established in this State that punitive or exemplary damages may be awarded when torts are committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard for the rights of others.") (citing *Consol. Coal Co. v. Haenni*, 35 N.E. 162, 165 (Ill. 1893)); *accord, e.g., Giles v. General Motors*, 802 N.E.2d 858, 865-66 (Ill. App. Ct. 2003) (denying motion to dismiss claim for punitive damages where plaintiff pleaded willful and wanton conduct in conjunction with allegations of negligence); *Doe v. Chand,* 781 N.E.2d 340, 349 (Ill. App. Ct. 2002) (stating that "[p]unitive damages are warranted where an otherwise negligent act is accompanied by outrageous conduct or acts committed with malice or reckless indifference to the rights of others.")

For the foregoing reasons, the Court grants DMB's motion to dismiss Count IV for failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). The Court also gives Plaintiff leave to amend its complaint and replead its remaining causes of action if it determines that such amendment is necessary to sufficiently allege willful and wanton conduct so as to support any particular damages theory. *See* Fed. R. Civ. P. 15(a); *see, e.g., Brunt v. Serv. Employees Int'l Union*, 284 F.3d 715, 720 (7th Cir. 2002) ("Rule 15(a) provides that leave to amend a pleading shall be freely given when justice so requires.").

IV.    Public Nuisance

Wohl moves to dismiss Count II for public nuisance on the grounds that Plaintiff has failed to state a claim upon which relief can be granted. The Court finds that Plaintiff has

misconduct so as to overcome the tort immunity of city, public agency and public employees). However, for the case at hand, there is no applicable immunity statute that would necessitate Plaintiff bringing a separate cause of action for willful and wanton misconduct.

20

adequately stated a claim for public nuisance and therefore denies Wohl's motion.

The Illinois Supreme Court has defined public nuisance as "an unreasonable interference with a right common to the general public." *See City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1111 (Ill. 2004) (internal quotation marks and citation omitted). Illinois law further establishes that a public nuisance is "the doing of or the failure to do something that injuriously affects the safety, health or morals of the public, or works some substantial annoyance, inconvenience, or injury to the public. *Id.* at 1114 (collecting authorities, including *Vill. of Wilsonville v. SCA Servs., Inc.*, 426 N.E.2d 824, 837 (Ill. 1981)); *accord City of Chicago v. Am. Cyanamid Co.*, 823 N.E.2d 126, 131 (Ill. App. Ct. 2005). To state a cause of action for public nuisance, a basis must be alleged in support of (1) the existence of a public right; (2) a substantial and unreasonable interference with that right by the defendant; (3) proximate cause; and (4) injury. *See Beretta*, 821 N.E.2d at 1113. "Thus, the first element that must be alleged to state a claim for public nuisance is the existence of a right common to the public." *Id.* at 1114. Precedent instructs that the concept includes, for example, "the right of public health, public safety, public peace, public comfort, and public convenience." *Id.* (citation omitted). For public nuisance actions, a private individual may recover damages only if he has "suffered harm of a kind different from that suffered by other members of the public exercising the right common to the public that was the subject of interference." *Young v. Bryco Arms*, 821 N.E.2d 1078, 1083 (Ill. 2004) (noting that "special damage" requirement is "well-established law in Illinois.") (internal quotation marks and citation omitted); *see also In re Starlink Corn Prods. Liab. Litig.*, 212 F. Supp. 2d at 848 ("The harm must be of a different type, not merely a difference in severity or imposing a disproportionate share of the burden on plaintiffs.").

As for the pleading standards for public nuisance, precedent teaches that they "are not exacting because the 'concept of common law public nuisance eludes precise definition.'" *Beretta* at 1110 (quoting *City of Chicago v. Festival Theatre Corp.*, 438 N.E.2d 159, 164 (Ill. 1982)); *Am. Cyanamid Co.*, 823 N.E.2d at 129. Federal district courts (reviewing pleadings under the more lenient standards of Fed. R. Civ. P. 12(b)(6)) have similarly commented. *See, e.g., In re Starlink Corn Prods. Liab. Litig.*, 212 F. Supp. 2d at 848 (denying a motion to dismiss public nuisance claim and noting the "limited depth of review courts typically undertake on a motion to dismiss a public nuisance claim.").

Wohl argues that Plaintiff has not alleged a violation of a public right and instead has "merely asserted an alleged violation of an individual right that has resulted in harm to individual members of the general public." (D.E. 14 at 7.) In support of his argument, Wohl points to the standard for a public right articulated in *Am. Cyanamid*: a public right is "collective in nature and not like the individual right that everyone has not to be assaulted or defamed or defrauded or negligently injured." *Id.*, 823 N.E.2d at 131 (internal quotation marks and citation omitted). The Court respectfully disagrees with Wohl's characterization of Plaintiff's allegations. Although the Complaint does not explicitly name the public rights at issue, the Court can infer that Plaintiff is alleging a violation of the public's right to health, welfare and comfort based on having large amounts of human waste discharged into a public waterway.[8] (*See* D.E. 1 ¶¶ 20, 26, 27); *see, e.g., In re Starlink Corn Prods. Liab. Litig.*, 212 F. Supp. 2d at 848 (alleged public right of "health, safety, comfort and convenience" relating to the alleged contamination of corn and food

---

[8] At the stage of a motion to dismiss, the court must accept the plaintiff's allegations as true and draw all reasonable inferences in the plaintiff's favor. *See Bressner v. Ambroziak*, 379 F.3d 478, 480 (7th Cir. 2004).

supply "certainly satisfied" permissive pleading standard for public nuisance); *City of Chicago v. Latronica Asphalt & Grading, Inc.*, 805 N.E.2d 281, 290 (Ill. App. Ct. 2004) (illegal disposal of construction debris resulted in violation of public right because "waste disposed of on the Site became airborne and scattered onto the public way and nearby properties.") (internal quotation marks omitted). Thus, the Court believes that Plaintiff has alleged a sufficient violation of a public right.

Moreover, Plaintiff's claim falls within the well-established category of nuisance cases that invoke the public right to be free from "odors, fumes, dust, and other sources of pollution." *See Beretta*, 821 N.E.2d at 1114 (collecting Illinois public nuisance cases where the "[p]ublic comfort has been affected by odors, fumes, dust, and other sources of pollution."). Plaintiff's allegation of a violation of a public right relating to the Chicago River also resembles many other public nuisance claims because the allegations deal with the contamination of "an indivisible resource shared by the public at large, like air, water, or public rights of way." *Am. Cyanamid*, 823 N.E.2d at 131; *see also id.* (offering as illustrations of violations of public rights "prevent[ing] the use of public bathing beach" or a "kill[ing] the fish in a navigable stream"); *accord, e.g., Latronica Asphalt*, 805 N.E.2d at 287 (stating that public nuisance includes the causing or allowing of "any offal [or] filth . . . to be collected, deposited or to remain in any place, to the prejudice of others.") (internal quotation marks and citation omitted); *Tamalunis v. City of Georgetown*, 542 N.E. 2d 402, 410 (Ill. Ct. App. 1989) ("The Illinois Supreme Court has determined the discharge of untreated sewage and the illegal dumping of refuse to be abatable nuisances.") (collecting cases); *Cook v. City of Du Quoin*, 1930 WL 3039, at *2 (Ill. App. Ct. 1930) (city's discharge of sewage into creek was a public nuisance).

23

Bearing in mind the "permissive standard" for pleading a public right, the Court concludes that Plaintiff has alleged sufficiently a violation of the public's right to health, welfare and comfort relating to the indivisible resource of the Chicago River. *See In re Starlink Corn Prods. Liab. Litig.*, 212 F. Supp. 2d at 848. Accordingly, the Court denies Wohl's motion to dismiss the claim for public nuisance.

V.    Public Nuisance and Trespass Damages

DMB requested that the Court dismiss or strike Plaintiff's prayer for relief for public nuisance to the extent that Plaintiff seeks recovery of "prospective or future damages," or damages other than for its "personal inconvenience, annoyance and discomfort." (D.E. 13 at 11.) To the extent that Plaintiff requests damages based on Defendants' future conduct, the Court agrees with DMB that future or prospective damages are unavailable for Plaintiff's public nuisance action. *See Beretta*, 821 N.E.2d at 1138 ("An award for damages in an action for nuisance is retroactive, applying to past conduct . . . .") (internal quotation marks and citation omitted). However, the Court disagrees with DMB that Plaintiff's potential recovery is limited to damages for personal inconvenience, annoyance and discomfort.

As an initial matter, recent Illinois Supreme Court precedent dealing with private nuisance[9] instructs that "[a] plaintiff in a private nuisance action may recover *all consequential*

_____

[9] Although the cause of action of public nuisance "eludes precise definition" (*City of Chicago v. Am. Cyanamid Co.*, 823 N.E.2d 126, 129 (Ill. App. Ct. 2005)), Illinois courts have defined it sufficiently to recognize it as a separate action from private nuisance. *See City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1110 (Ill. 2004) (noting that public nuisance is often "'negatively defined' by distinguishing it from other tort actions") (quoting *City of Chicago v. Festival Theatre Corp.*, 438 N.E.2d 159, 164 (Ill. 1982)). In this regard, Illinois law defines a private nuisance as "a nontrespassory invasion of another's interest in the private use and enjoyment of land" *In re Starlink Corn Prods. Liab. Litig.*, 212 F. Supp. 2d 828, 844-45 (N.D. Ill. 2002) (internal quotation marks and citation omitted). Illinois law defines a public

*damages* flowing from the injury to the use and enjoyment of his or her person or property.

However, recovery of damages for solely economic loss is not permitted." *In re Chicago Flood Litig.*, 680 N.E.2d at 278 (citing *Schatz v. Abbott Labs., Inc.*, 281 N.E.2d 323 (Ill. 1972) (other citations omitted) (emphasis added).[10] Although Plaintiff's claim is for public nuisance rather than for private nuisance, Defendants offer no basis to conclude that the rule should be different, and the Court finds that Plaintiff should be able to claim consequential damages.

For public nuisance actions, a private individual may recover damages only if he has

___

nuisance as "an unreasonable interference with a right common to the general public." *Id.* at 848 (internal quotation marks and citation omitted).

[10] As the parties discuss, Illinois law distinguishes between two types of damages for private nuisance—damages caused by permanent nuisances and those caused by temporary nuisances. *See Statler v. Catalano*, 521 N.E.2d 565, 571 (Ill. App. Ct. 1988). "A permanent nuisance is one characterized as continuing indefinitely and the structure constituting the nuisance is a lawful one, or one which the person or entity has a legal right to maintain. . . . A temporary nuisance is one which is occasional, intermittent, or recurrent and is remediable, removable or abatable." *Tamalunis v. City of Georgetown*, 542 N.E.2d 402, 404 (Ill. App. Ct. 1989). Precedent instructs that "the proper measure of damages for a permanent nuisance is the market value of the land, while the proper measure of damages for a temporary nuisance is the discomfort and deprivation of the use and enjoyment of a person's home." *Statler*, 521 N.E.2d at 571; *see also Tamalunis*, 542 N.E.2d at 410 ("Generally, the measure of damages for a temporary nuisance is the personal inconvenience, annoyance, and discomfort suffered on account of the nuisance.") (collecting cases). However, contrary to DMB's assertion, precedent also teaches that the amount recoverable for temporary nuisance "cannot be gauged by any definite rule," and may include, under appropriate circumstances, lost profits, where they can be determined with reasonable certainty. *Schatz v. Abbott Labs., Inc.*, 281 N.E.2d 323, 325-26 (Ill. 1972); *see id.* at 326 ("Where, as here, plaintiffs' damages flow from a loss of business, the amount of compensation should be the same whether the cause be a breach of contract, negligence or nuisance.") (citation omitted). Moreover, the nuisance at issue in *In re Chicago Flood Litig.* would seem to be characterized as temporary, and in light of the Illinois Supreme Court permitting "all consequential damages" for that nuisance, the Court disagrees with DMB that recovery for private nuisance actions is restricted to damages for personal inconvenience, annoyance, and discomfort. *See id.*, 680 N.E.2d at 279. The Court provides this context on the damages available for private nuisance actions because of the close relationship between public and private nuisance and because parties refer to private nuisance cases in their briefs.

"suffered harm of a kind different from that suffered by other members of the public exercising the right common to the public that was the subject of interference." *Young*, 821 N.E.2d at 1083 (internal quotation marks and citation omitted). The types of special damage that private plaintiffs bringing public nuisance actions may allege include, for example, "physical harm to chattels." *In re Starlink Corn Prods. Liab. Litig.*, 212 F. Supp. 2d at 848.

In the instant case, Plaintiff alleges physical harm to chattels, by stating, for example, that *Chicago's Little Lady* was "contaminat[ed]." (D.E. 1 ¶ 40.) Plaintiff's allegations of harm are of a different type than the harm allegedly done to the public's rights of health and comfort. Therefore, Plaintiff has alleged sufficient special harm to state a claim for private damages and should be able to recover for those damages. *See In re Starlink Corn Prods. Liab. Litig.*, 212 F. Supp. 2d at 848 (farmers were able to state a claim for private action for public nuisance by alleging both contamination of the public's food supply (public harm) and damages to their fields, grain supply, and their crop sales (private harm)).

DMB suggests in passing that Plaintiff's damages for Count I, its claim of trespass, should be "similarly limited," because "'the same rules of damages apply whether the action be in trespass or for a nuisance.'" (D.E. 21 at 14-15 (quoting *Kugel v. Vill. of Brookfield*, 54 N.E.2d 92, 95 (Ill. App. Ct. 1944).) *But see Ariola v. Nigro*, 156 N.E.2d 536, 543 (Ill. 1959) ("With reference to the issue of damages, the rule is well-established that one who trespasses or assumes control over the property of another without authority is responsible for all the consequences.") (citation omitted). Assuming that DMB states a still-correct proposition of law, the Court's analysis permitting recovery of consequential damages for the public nuisance claim should apply for the trespass claim. Thus, the Court concludes that Plaintiff's recovery for Count I is

26

not limited to damages for personal inconvenience, annoyance and discomfort.

Accordingly, the Court grants DMB's motion to strike Plaintiff's claims for damages for Counts I and II to the extent that Plaintiff seeks future or prospective damages. The Court denies DMB's motion to dismiss or strike Plaintiff's claims for damages outside of the category of personal inconvenience, annoyance, and discomfort.

VI. Punitive Damages Analysis

DMB moves to strike or to dismiss Plaintiff's request for punitive damages for Counts I – IV, arguing that Plaintiff has failed to allege a basis for an award of punitive damages against DMB. (D.E. 11 at 1-2.) The Court agrees with DMB's argument.

DMB suggests, and the Complaint reflects, that *respondeat superior* is the theory of Plaintiff's case against DMB—*i.e.*, DMB is liable as Wohl's employer. (D.E. 13 at 3-4; *see, e.g.*, D.E. 1 ¶ 23 ("At all times relevant to this complaint, Wohl acted under the supervision of the Band and within the scope of his employment duties."); *id.* ¶ 10 ("The Band was and is Wohl's principal and Wohl is the Band's agent. The Band was and is, therefore, responsible for any conduct by Wohl in furtherance of his duties on behalf of the Band."); *see also id.* ¶¶ 8, 9.)[11] Precedent teaches that when liability of a corporate defendant is predicated on *respondeat superior*, "the punitive and admonitory justifications for the imposition of punitive damages are

___

[11] Plaintiff argues that the use of the plural "Defendants," and references to "Wohl and the Band" in the Complaint serve to "expressly allege . . . the Band's complicity" in the wrongful conduct. (Plaintiff's Response to DMB's Motion to Dismiss at 4.) However, the Complaint states that "Wohl intentionally, illegally and purposefully caused the contents of the motor coach's human waste collection tank to empty through the drain underneath the motor coach into the river." (D.E. 1 ¶ 20.) Because the Complaint indicates that Wohl singlehandedly committed the tortious act at issue, the Court reads boilerplate plural references such as "Defendants' deliberate and reckless discharge . . . " as merely serving to allege DMB's vicarious liability as opposed to alleging any direct liability. (*Id.* ¶ 33.)

27

sharply diminished." *Mattyasovszky v. W. Towns Bus Co.*, 330 N.E.2d 509, 512 (Ill. 1975). Imposition of punitive damages in situations of vicarious liability is "narrowly circumscribed." *Kennan v. Checker Taxi Co., Inc.*, 620 N.E.2d 1208, 1212 (Ill. App. Ct. 1993). The Illinois Supreme Court in *Mattyasovszky* delineated four situations where there was adequate "corporate complicity" for punitive damages to lie against a principal for the act of an agent: "(a) the principal authorized the doing and the manner of the act; (b) the agent was unfit and the principal was reckless in employing him; (c) the agent was employed in a managerial capacity and was acting in the scope of his employment; or (d) the principal or a managerial agent of the principal ratified or approved the act." *Id.*, 330 N.E.2d at 512 (internal quotation marks and citation omitted); *Jannotta v. Subway Sandwich Shops, Inc.*, 125 F.3d 503, 513-14 (7th Cir. 1997) (same); *Smith v. Am. Gen. Life & Accident Ins. Co.*, No. 99 C 3743, 2002 WL 215527, at *9 (N.D. Ill. Feb. 11, 2002) (Lefkow, J.) (same). To establish the requisite corporate complicity for an award of punitive damages, the plaintiff must offer a basis to find that there has been "*deliberate corporate participation.*" *Kennan*, 620 N.E.2d at 1212 (emphasis in *Kennan*; citing *Tolle v. Interstate Sys. Truck Lines, Inc.*, 356 N.E.2d 625, 627 (Ill. App. Ct. 1976)).

In the present matter, Plaintiff has not made allegations that would equate to "deliberate corporate participation" on the part of DMB, which is a prerequisite to the imposition of such sanctions under Illinois law in this context. *See, e.g., Kennan*, 620 N.E.2d at 1212 (internal quotation marks, citation, and emphasis omitted). The only actions allegedly taken by DMB relating to this lawsuit were employing Wohl and withholding income taxes, Social Security and Medicare taxes from his paycheck. (*See* D.E. 1 ¶¶ 8, 9.) Because of that employment relationship, Plaintiff alleges that DMB had the right to control and direct how Wohl performed

28

his duties and that DMB is therefore responsible for Wohl's conduct in the furtherance of his duties on behalf of DMB. (*See id.* ¶ 10.) These allegations are sufficient to state a claim for vicarious liability against DMB. However, as a basis for an award of punitive damages against DMB, the Court does not regard these allegations, at least as pleaded, as "the sort of deliberate action . . . which would bring [them] within the complicity rule." *Brummerstedt v. Am. Airlines, Inc.*, 845 F. Supp. 532, 534 (N.D. Ill. 1993) (Aspen, J.) (dismissing claim for punitive damages where plaintiff did not indicate that the corporation participated in or condoned the employee's alleged misconduct, or that the employee was a manager acting within the scope of employment); *see also Bahl v. D.A. Express, Inc.*, No. 90 C 20014, 1990 WL 304278, at *1 (N.D. Ill. June 14, 1990) (Roszkowski, J.) (striking punitive damages portion of complaint given that plaintiff did not allege that corporate defendant "approved, authorized or ratified" the employee's alleged misconduct).

Plaintiff cites to *Arlington Fin. Corp. v. Ben Franklin Bank of Ill.*, No. 98 C 7068, 1999 WL 89567 (N.D. Ill. Feb. 16, 1999) (Conlon, J.), for the proposition that "where a complaint states claims which may allow a finding of culpable conduct by the defendant depending on facts developed through discovery, it would be 'inappropriate to foreclose prematurely the possibility of recovery of punitive damages.'" (Plaintiff's Response to DMB's Motion to Dismiss at 4 (quoting *Arlington Fin. Corp.*, 1999 WL 89567, at *7).) However, the present matter is distinguishable from *Arlington*. *Arlington* was testing the claim for punitive damages for the sufficiency of its allegations of willful misconduct, as opposed to the sufficiency of allegations of deliberate corporate participation. *See Arlington*, 1999 WL 89567, at *6. Judge Conlon's opinion in *Arlington* cannot fairly be read to abrogate the principle of Illinois law that, in this

29

*respondeat superior* setting, the punitive and admonitory justifications for awarding punitive damages are relatively weak, such that precedent requires allegations of some corporate participation in the misconduct. *See, e.g., Brummerstedt*, 845 F. Supp. at 534 ("Where the employer itself has committed no intentional wrong, then, Illinois courts will not impose the harsh sanction of punitive damages.") (collecting cases); *Twardy v. Northwest Airlines, Inc.*, No. 00 C 6493, 2001 WL 199567, at *5 (N.D. Ill. Feb. 28, 2001) (Plunkett, J.). Nor can *Arlington* be fairly read to eliminate a plaintiff's burden to at least outline or adumbrate a basis for seeking punitive damages—which burden Plaintiff has failed to meet. Because the Complaint lacks any allegations of corporate participation by DMB, the Court finds that Plaintiff has not sufficiently stated a claim for punitive damages.

The Court also rejects Plaintiff's argument that "the factual predicates demonstrating the Band's participation or corporate complicity in Wohl's illegal conduct are substantially similar to those alleged by the plaintiff in *Deal v. Byford*." (Plaintiff's Response to DMB's Motion to Dismiss at 5.) In *Deal v. Byford*, 537 N.E.2d 267 (Ill. 1989), the Illinois Supreme Court ruled that there was a sufficient basis to impose punitive damages against a principal under a theory of *respondeat superior*. *See id.* at 273. In that case, it was undisputed that the employee who committed the misconduct was the "resident manager" of the apartment complex and was "acting within the scope of his employment." *Id.* The court determined that these admissions met the standard of the fourth corporate complicity situation of *Mattyasovszky*. *See id.* (permitting "the imposition of punitive damages against a principal when the agent is employed in a managerial capacity and is acting within the scope of his employment."). Because the Plaintiff does not seriously even allege that Wohl was playing a managerial role (indeed, Wohl is alleged to be a

30

bus driver) while operating one of DMB's tour buses, the outcome in *Deal* does not aid Plaintiff's request for punitive damages.

The Court concludes that Plaintiff's demand for punitive damages against DMB should be stricken without prejudice. Plaintiff is given leave to amend its complaint and replead its claims for punitive damages against DMB. *See* Fed. R. Civ. P. 15(a); *see, e.g., Brunt*, 284 F.3d at 720.[12]

---

[12] However, in repleading, Plaintiff should be wary of making conclusory allegations that merely parrot the corporate complicity standard for punitive damages. *See, e.g., Twardy v. Northwest Airlines, Inc.*, No. 00 C 6493, 2001 WL 199567, at *5 (N.D. Ill. Feb. 28, 2001) (Plunkett, J.) (stating that allegations such as "[d]efendant authorized the act the way in which it was done" were insufficient to state a claim for punitive damages in *respondeat superior* setting).

## CONCLUSION

For the reasons stated above, the Court respectfully denies in part and grants in part the various motions to dismiss and motion to strike. (D.E. 11, 14.) The Court dismisses Counts III and IV without prejudice, strikes Plaintiff's claims for future or prospective damages for Counts I and II, and strikes Plaintiff's requests for punitive damages against DMB for Counts I-V without prejudice.

So ordered.

Mark Filip
United States District Judge
Northern District of Illinois

Date: *November 22, 2005*